# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| MARK FESSLER, AMBER FESSLER, ANDREW HOCKER, KEVIN REUSS, MATTHEW CARRERAS, CHARLES HANDLY, MICHELLE HANDLY, AARON STONE, STACEY STONE, DANIEL SOUSA, and SHARON SOUSA, on Behalf of Themselves and Those Similarly Situated, *Plaintiffs*, | § § § § § § § § § § § | Civil Action No.  4:19-CV-248 Judge Mazzant |
| | § | |
| STEVEN CONE, JOANNA CONE, MARK FESSLER, AMBER FESSLER, ANDREW HOCKER, and MATTHEW CARRERAS, on Behalf of Themselves and Those Similarly Situated; and AARON STONE, STACEY STONE, DANIEL SOUSA, and SHARON SOUSA, *Plaintiffs*, | § § § § § § § § § | Civil Action No.  4:17-CV-001 Judge Mazzant |
| | § | |
| v. | § | |
| | § | |
| PORCELANA CORONA DE MÉXICO, S.A. DE C.V. f/k/a SANITARIOS LAMOSA S.A. DE C.V. a/k/a VORTENS, *Defendant*. | § § § § | |

## MEMORANDUM OPINION AND ORDER AND <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Pending before the Court are Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Entry of Findings of Fact and Conclusions of Law (4:17-cv-1 Dkt. #353; 4:19-cv-248 Dkt. #111), Plaintiffs' and Class Counsel's Motion for Entry of Findings of Fact and Conclusions of Law (4:17-cv-1 Dkt. #354; 4:19-cv-248 Dkt. #112), Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Leave to File Exhibit to Proposed Findings of Fact (4:17-cv-1 Dkt. #356), Plaintiffs' and Class Counsel's Opposed Motion for Leave to File Objections to Porcelana's Sur-Reply and New Evidence (4:17-cv-1 Dkt. #366; 4:19-cv-248 Dkt. #125), and

Plaintiffs' and Class Counsel's Unopposed Motion for Leave to Supplement the Record in Light of Joint Status Report on Claims Administration (4:17-cv-1 Dkt. #374; 4:19-cv-248 Dkt. #133).[1]

Having considered the Motion and the relevant pleadings, the Court finds that Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Entry of Findings of Fact and Conclusions of Law (4:17-cv-1 Dkt. #353; 4:19-cv-248 Dkt. #111) should be **GRANTED in part** and **DENIED in part**, Plaintiffs' and Class Counsel's Motion for Entry of Findings of Fact and Conclusions of Law (4:17-cv-1 Dkt. #354; 4:19-cv-248 Dkt. #112) should be **GRANTED in part** and **DENIED in part**, Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Leave to File Exhibit to Proposed Findings of Fact (4:17-cv-1 Dkt. #356) should be **GRANTED**, Plaintiffs' and Class Counsel's Opposed Motion for Leave to File Objections to Porcelana's Sur-Reply and New Evidence (4:17-cv-1 Dkt. #366; 4:19-cv-248 Dkt. #125) should be **DENIED as MOOT**, and Plaintiffs' and Class Counsel's Unopposed Motion for Leave to Supplement the Record in Light of Joint Status Report on Claims Administration (4:17-cv-1 Dkt. #374; 4:19-cv-248 Dkt. #133) should be **DENIED as MOOT.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On January 1, 2017, Steven and Joanna Cone filed their Original Complaint and Class Action on behalf of themselves and those similarly situated, asserting claims against Sanitarios Lamosa S.A. DE C.V. also known as Vortens, Inc. (Dkt. #1), now known as Porcelana Corona De México, S.A. DE C.V. ("Porcelana") (Dkt. #74). Originally, Plaintiffs were suing both Sanitarios Lamosa S.A. DE C.V. and Vortens, Inc. as two separate Defendants (Dkt. #1; Dkt. #4). As the

---

[1] Because this order is based on the remand of a consolidated fee-award action, identical motions, responses, replies, and sur-replies were filed in the above-captioned cases. The only pending motion that is not strictly identical between the two cases is Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Leave to File Exhibit to Proposed Findings of Fact (4:17-cv-1 Dkt. #356). An identical motion was filed in the other docket; however, that motion was resolved. Accordingly, throughout this Order, the Court cites to only those filings on the docket for case 4:17-cv-1. However, when the Court references a filing in one docket, the Court is also referencing the corresponding, identical filing in the other docket.

litigation progressed, however, who Plaintiffs should be suing became clear and, now, the only Defendant is Porcelana (Dkt. #74).

In the Original Complaint, Plaintiffs alleged that the defective tanks included tank models #3464, #3412, #3404, #3425, #3408 and #3571 manufactured, produced, designed, marketed, or distributed by Defendant between 2004 and 2012 (Dkt. #1).  On March 27, 2017, Plaintiffs filed their First Amended Complaint and Class Action (Dkt. #4).  On January 19, 2018, Plaintiffs filed their Second Amended Complaint (the "Operative Complaint") (Dkt. #74).  In the Operative Complaint, Plaintiffs alleged that the defective tanks included tank models #3464, #3412, #3404, #3425, and #3436 manufactured, produced, designed, marketed, or distributed by Defendant between 2004 and 2012.

On March 24, 2020, after multiple settlement agreements, the Court entered its Final Order and Judgment in this case (Dkt. #281).  On May 13, 2020, the Court issued its Amended Final Judgment in this case ("Final Judgment") (Dkt. #289).  The Final Judgment awarded Plaintiffs $4,333,949.50 in attorneys' fees and $371,354.98 in litigation expenses and costs.  The attorneys' fee award was based on the Court's analysis in a prior order issued on April 24, 2020 (Dkt. #285) after a motion filed by Nathan Carpenter and Rebecca Bell-Stanton (collectively, "Class Counsel") requesting the Court award Class Counsel attorneys' fees (Dkt. #275).  *See also Fessler v. Porcelana Corona de Mex., S.A. de C.V.*, No. 4:17-CV-00001, 2020 WL 1974246 (E.D. Tex. Apr. 24, 2020), *vacated and remanded sub nom. Fessler v. Porcelana Corona De Mex., S.A. DE C.V.*, 23 F.4th 408 (5th Cir. 2022).  On May 15, 2020, Defendant appealed the attorneys' fees order and the Final Judgment to the Court of Appeals for the Fifth Circuit.  The only issue presented on appeal was whether "the district court err[ed] in ordering Appellant to pay Plaintiffs' counsel approximately $4.3 million in attorney's fees?" (Case No. 20-40357, Dkt. #50 at p. 13).  Defendant

did not challenge the Court's Final Judgment on any other grounds.

On January 10, 2022, in a split decision, the Fifth Circuit vacated and remanded the Final Judgment.  The Fifth Circuit found two errors in this Court's attorneys' fees award: (1) "fail[ing] to make any factual findings regarding the nature of the Class's unsuccessful claims," and (2) "fail[ing] to properly analyze the award in relation to the results obtained."  *Fessler v. Porcelana Corona De Mex., S.A. DE C.V.*, 23 F.4th 408, 417, 418 (5th Cir. 2022).  As to the first error, the Fifth Circuit instructed this Court on remand to "address the 'common core of facts' and 'common legal theories' sufficiently so that no fees are awarded on unsuccessful theories."  *Id.* at 418.  To the second error, the Fifth Circuit instructed this Court to "consider the amount of damages and non-monetary relief sought compared to what was actually received by the Class."  *Id.*  The Fifth Circuit issued its mandate, directing this Court to conduct further proceedings consistent with its appellate opinion (Dkt. #325 at p. 5).

Based on the Fifth Circuit's mandate, the parties filed several rounds of motions.  First, Plaintiffs filed a motion requesting that the Court enforce the portion of the Final Judgment awarding $371,354.98 in litigation expenses because it was neither addressed nor discussed in the Fifth Circuit's mandate opinion (Dkt. #328).  Defendant argued that the Court could not enforce the litigation expenses award in the Final Judgment because the Fifth Circuit vacated the Final Judgment in its entirety and enforcing the award would violate the Fifth Circuit's mandate.  The Court agreed with Plaintiffs and enforced the award (Dkt. #332).  While Defendant had the right and opportunity to appeal the litigation costs and expenses, it chose not to, and any issues not briefed on appeal are waived.  Thus, the Court was not required to reconsider the award of litigation expenses.

The Fifth Circuit's mandate did, however, require that this Court reconsider its previous

opinion awarding attorneys' fees.  Accordingly, on June 30, 2022, Defendant and Class Counsel filed the present motions requesting the Court enter findings of fact and conclusions of law regarding Plaintiffs' successful claims and re-examine the Court's prior attorneys' fees award. After consideration of the arguments and the record, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2]  To the extent that any of the findings of fact constitute conclusions of law, or any of the conclusions of law constitute findings of fact, they are adopted as such.

---

[2] In preparing this memorandum opinion and order, the Court carefully considered the entire record, including the parties' filings and briefings specific to their requests for findings of fact and conclusions of law, and subsequently applied the Fifth Circuit standard for findings and conclusions under Federal Rule of Civil Procedure 52. *See Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 935–36 (5th Cir. 2019); *see also* 9C Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2579 (3d ed.).  Since the "findings of fact and conclusions of law must be 'sufficient in detail and exactness to indicate the factual basis for the ultimate conclusion reached,'" *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 819 (5th Cir. 2020) (quoting *Lettsome v. United States*, 434 F.2d 907, 909 (5th Cir. 1970)), the Court "need only make brief, definite, pertinent findings and conclusions upon the contested matters," FED. R. CIV. P. 52(a) advisory committee's note to 1946 amendment.  This standard does not require the Court to "expressly respond like a debate champion to every evidentiary or factual contention made by the losing side." *Richard v. Reg'l Sch. Unit* 57, 901 F.3d 52, 59 (1st Cir. 2018); *see Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (collecting cases).  The facts contained herein are either undisputed or the Court has made such findings based on the record before it.

# FINDINGS OF FACT[3]

## I.     Toilet Tank Models and Manufacturing Plants

The tank models at issue throughout the course of this litigation were #3412, #3464, #3404, #3425, #3408, #3436, and #3571.   The tank models at issue in the Operative Complaint were #3412, #3464, #3404, #3425, and #3436.   The tank models at issue after the first, partial settlement were #3412, #3464, #3425, and #3436.   The tank models for which Plaintiffs ultimately recovered are #3412 and #3464.[4]   Additionally, there were two manufacturing plant locations at which these toilet models were made: Benito Juarez, Mexico and Monterrey, Mexico.

To start, tank model #3571 is not a valid tank number because there is no tank model #3571 in existence.   Models #3412, #3464, and #3425 were manufactured in Benito Juarez and are all of similar design.   While model #3412 was entirely manufactured at the Benito Juarez plant, models

---

[3] There is much dispute between the parties regarding the "law of the case."   Defendant seems to imply that the Fifth Circuit's limited background section in the order fully encompasses the broad factual scope of this case and that the Court, therefore, "is not at liberty to revisit" the facts and make factual findings on remand.   However, to suggest that the Court cannot make factual findings beyond the Fifth Circuit's high-level recitation of the factual and procedural background of the case is incorrect.   The "law of the case" doctrine dictates that "a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation."   *F.D.I.C. v. McFarland*, 243 F.3d 876, 884 (5th Cir. 2001).   Typically, the law of the case doctrine "precludes reexamination of issues of law or fact decided on appeal, either by the district court on remand or by the appellate court itself on a subsequent appeal."   *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001).   However, "the law of the case doctrine applies only to issues that were *actually decided*, rather than all questions in the case that might have been decided, but were not."   *Id.* (emphasis added) (citing *Morrow v. Dillard*, 580 F.2d 1284, 1290 (5th Cir. 1978).   This is true whether the issues were actually decided or implicitly decided.   *Id.*   Notably, though, "[t]he recitation of facts is not a factual determination."   *Torres v. SGE Mgmt., L.L.C.*, No. 18-20801, 2020 WL 12787355, at *1 (5th Cir. Jan. 21, 2020).

The Fifth Circuit's brief mention of facts is not a decision on an issue of law or fact.   To be sure, the Fifth Circuit's mandate did not make any specific factual findings.   Rather, the Fifth Circuit's mandate required that this Court make factual findings and apply those findings to the Court's attorneys' fees analysis.   Moreover, the Court's findings of facts and conclusions of law do not necessarily contradict the Fifth Circuit's recitation of facts.   Instead, the Court's findings and conclusions elaborate on the facts of the case and provide context to the many nuanced determinations and decisions made throughout the life of this case.   This case, in particular, has been factually and procedurally convoluted.   The Fifth Circuit's mandate necessitates that this Court make specific factual determinations and apply those determinations to the Court's analysis on the results obtained by Plaintiffs so that the Court may determine an appropriate attorneys' fee award.   That is exactly what the Court does in this order.

[4] Andrew Hocker owned three model #3436 tanks for which he brought individual claims and for which he did receive monetary compensation in exchange for releasing his claims against Defendant.

#3464 and #3425 were also manufactured in Monterrey.  However, model #3464 was mostly manufactured at the Benito Juarez plant and model #3425 was mostly manufactured at the Monterrey plant.  Additionally, Defendant did not start manufacturing model #3425 until later on; model #3425 was not introduced into the market until 2012.

Model #3436, on the other hand, was manufactured exclusively at the Monterrey location. Additionally, the design of model #3436 differs from the design of models #3412, #3464, and #3425.  The record as a whole is unclear regarding which of the two manufacturing plant locations the other tank models, #3404 or #3408, were manufactured.  Therefore, the Court is unable to make any definitive factual finding regarding where tank models #3404 or #3408 were manufactured.

## II.    Defendant's Press Release and Replacement Program

In July of 2016, Defendant released a press statement indicating that model #3464 and #3412 tanks were affected by certain technical issues.  These technical issues were allegedly causing the tanks to fracture.  In the press release, Defendant stated that claims on the tanks have been low and that issues identified by Defendant were concentrated to model #3464 and #3412 tanks which were manufactured in 2011.  Defendant further stated that it had adjusted the manufacturing process to minimize the possibility that technical issues will continue to plague model #3412 and #3464 tanks.

In 2017, Defendant put together what it dubbed a limited program regarding model #3412 and #3464 tanks.  This program allowed owners of these models to exchange their #3412 or #3464 tank for a new replacement tank.  While any customers who made claims under this program were not charged the cost of the toilet tank replacement, the customers were responsible for any charges or costs associated with the new tank replacement and installation and were required to execute a

release.

Under the release signed by the individuals who participated in the program, Defendant was not liable for any and all claims, causes of action, and damages related to a model #3412 or #3464 tank which had cracked  Additionally, the release signed by program participants waived any implied warranty of merchantability or warranty for a particular purpose.

## III.    Allegations in the Complaints

As has been the case since the inception of this litigation, Defendant disputes Plaintiffs' allegations and accepts no liability for Plaintiffs' claims that were brought or could have been brought in the above-captioned litigation.

### A.  The Original and First Amended Complaint

The Original Complaint was filed on January 1, 2017, and the First Amended Complaint was filed on March 27, 2017.  The allegations in both complaints revolve around the same causes of action, tank models,[5] manufacturing years, and proposed classes: models #3464, #3412, #3404, #3425, #3408, and #3571 for the years 2004 through 2012, with the proposed class members including all owners of these tanks across the United States.   However, the First Amended Complaint added new named Plaintiffs.

The initial lawsuit only named Steven and Joanna Cone as Plaintiffs.  In the First Amended Complaint, Michael and Kimberly Aftosmes, Don and Sheila Sander, Mark and Amber Fessler, Andrew Hocker, Kevin Reuss, and Matthew Carreras were also included as named Plaintiffs after the Court granted Plaintiffs' unopposed motion for joinder of these additional named Plaintiffs.

In the first two complaints, the proposed class was any and all consumers of toilet tank

---

[5] While there were allegations regarding model #3436 insofar as Andrew Hocker's personal claims are concerned, there were no class-wide allegations with respect to tank model #3436 in the Original Complaint or First Amended Complaint.

models #3464, #3412, #3404, #3425, #3408, and #3571 manufactured, produced, designed, marketed, or distributed by Defendant between 2004 and 2012.  If the Court chose not to certify the nationwide class, then the original complaint proposed a Texas-only version of the same class. Plaintiffs also acknowledged that it may be necessary to add sub-class definitions.

Furthermore, in the first two complaints, causes of action for strict liability, breach of the implied warranty of merchantability and implied warranty of fitness for a particular purpose, negligence, and violations of the Texas Deceptive Trade Practices Act (the "DTPA") were brought on behalf of all named Plaintiffs and proposed class members.  Along with compensatory relief, Plaintiffs sought punitive damages and injunctive relief.  In both complaints, Plaintiffs sought for the Court to enjoin Defendant from further selling, marketing, distributing and/or placing the designated tank models in the stream of commerce without making the tank models safe for their ordinary and intended purposes and/or absent clear and specific warnings to all consumers regarding the dangers of the allegedly defective tank models.

### B.  The Operative Complaint

The Second Amended Complaint, or the Operative Complaint, was filed on January 19, 2018.  In the Operative Complaint, Plaintiffs brought the same causes of action, maintained that the relevant manufacturing years were 2004 through 2012, and kept their claims regarding models #3464, #3412, #3404, #3425.  However, Plaintiffs dropped their claims regarding tank models #3408 and #3571 and officially added claims for tank model #3436.  Furthermore, the Operative Complaint expanded on the originally requested injunctive relief and also sought declaratory relief. Plaintiffs named in the Operative Complaint include Mark and Amber Fessler, Andrew Hocker, Kevin Reuss, Matthew Carreras, Charles and Michelle Handly, Aaron and Stacey Stone, and Daniel and Sharon Sousa.

In the Operative Complaint, there were two proposed classes: a nationwide class and, if necessary, a Texas-only class.  Plaintiffs defined the proposed nationwide class as all owners of Vortens toilet tank models #3464, #3412, #3404, #3425, and #3436 manufactured by Defendant during the years 2004 through 2012.  If the Court did not approve a nationwide class, the Operative Complaint proposed a Texas-only class of all Texas owners of Vortens toilet tank models #3464, #3412, #3404, #3425, and #3436 manufactured by Defendant during the years 2004 through 2012. The Operative Complaint also noted that Plaintiffs anticipated one or two subclasses may be necessary.  The first proposed subclass was comprised of owners of tank models #3464 or #3412 manufactured between 2011 and 2012.  The second proposed subclass was comprised of owners of tank models identified by the class definition, but which were excluded from the first subclass.

Although the Operative Complaint still contained causes of action for strict liability, breach of the implied warranties of merchantability and fitness for a particular purpose, and negligence, the individual for whom those causes of action were brought on behalf of changed.  The strict products liability and negligence causes of action were brought on behalf of all named Plaintiffs and the proposed nationwide class.  The breach of the implied warranties causes of actions were brought on behalf of both proposed classes and all named Plaintiffs.  And the cause of action for violations of the DTPA was brought on behalf of all named Plaintiffs and the Texas-only class.

Furthermore, Plaintiffs requested the following declaratory and injunctive relief: (1) an order enjoining Defendant from further selling, marketing, distributing, and/or otherwise placing the designated tank models, which were manufactured between 2004 and 2012 and still held in inventory, into the stream of commerce; (2) an order requiring Defendant to notify its sales representatives, distributors, and retailers of the injunctive order; (3) an order requiring Defendant to instruct its sales representatives, distributors, and retailers to cease and desist any further sales

of the tanks-at-issue still held in inventory by such distributor or retailer; (4) an order enjoining Defendant from continuing what Plaintiffs call public self-limiting and inaccurate statements that delay purchasers, consumers, or owners from mitigating harm or failing to claim available remedies; (5) a declaration that there is an actual controversy between Defendant and class members concerning the pleaded defect; (6) a declaration that the tanks-at-issue are defective and pose a serious risk to consumers, owners, and the general public; and (7) a declaration that the tanks-at-issue have common defects in their manufacture.  The injunctive and declaratory relief was requested on behalf of all the named Plaintiffs and the Texas-only class.

In the Operative Complaint, as part of the "Relief Requested" section, Plaintiffs sought detailed relief on behalf of themselves and similarly situated individuals.  Specifically, Plaintiffs asked the Court to grant the following relief in the Operative Complaint:

1. Certify this cause of action as a class action pursuant to Rule 23 and appoint Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

2. Award appropriate monetary damages to Plaintiffs and the proposed Class in an amount equal to the amount to remediate the premises or otherwise mitigate the imminent risk of additional damages in an amount to be determined at trial for the wrongful acts of Defendant described herein;

3. Award punitive damages upon proof of knowing and intentional gross negligence or malicious behavior;

4. Award all damages statutorily available to Texas consumers/owners in light of the deceptive trade practices of the Defendant, including but not limited to the trebling of damages and the awarding of attorney fees;

5. Award such equitable relief permitted, including an injunction requiring Defendant to

notify all Class Members that they are entitled to submit initial, additional, or supplemental requests for payment in connection with prior loss and/or damage to their structures and/or premises;

6.  Order Defendant to engage in accurate, corrective educational advertising;

7.  Award restitution as provided by law, inclusive of appropriate pre-judgment interest;

8.  Award reasonable and necessary attorneys' fees and costs to Class counsel; and

9.  Award such other and further relief in law or equity as the Court determines fair, reasonable, appropriate, and/or deems just.

### C.  Individual Allegations by The Named Plaintiffs

The named Plaintiffs to the lawsuit also sought compensation and relief based on the individual claims they brought against Defendant.  All the named Plaintiffs throughout the lawsuit owned model #3464 tanks and experienced damage to their real and/or personal property, except for Andrew Hocker who owned toilet tanks that were model #3436 tanks.  While most of the named Plaintiffs knew the model number and manufacturing year for the tanks that they owned, there were some that did not.

Plaintiffs that owned model #3464 tanks and knew the manufacturing year included (1) Steven and Joanna Cone, who owned four model #3464 tanks manufactured in 2006; (2) Michael and Kimberly Aftosmes, who owned three model #3464 tanks manufactured in 2012; (3) Don and Sheila Sander, who owned three model #3464 tanks manufactured in 2012; (4) Mark and Amber Fessler, who owned four model #3464 tanks manufactured in 2007, one of which cracked and caused damage to their house and personal property; (5) Charles and Michelle Handly, who owned five model #3464 tanks manufactured in 2011, two of which cracked and caused damage to their house and personal property; (6) Aaron and Stacey Stone, who owned three model

#3464 tanks manufactured in 2009, one of which cracked and caused damage to their house and personal property and a second of which began showing signs of cracking; and (7) Daniel and Sharon Sousa, who owned four model #3464 tanks manufactured in 2010, one of which cracked and caused damage to their house and personal property.

Additionally, Kevin Reuss owned three model #3464 tanks, one of which cracked and caused damage to his real and personal property, and Matthew Carreras owned four model #3464 tanks, one of which cracked and caused damage to his real and personal property.  As to the tanks owned by Kevin Reuss and Matthew Carreras, it is unclear what years these tanks were manufactured.  Lastly, Andrew Hocker owned three model #3436 tanks manufactured in 2011, two of which cracked and one of which caused real and personal property damage.

Eleven out of seventeen of the named Plaintiffs experienced spontaneous cracking of their toilet tanks.  That is, every named Plaintiff aside from Steven and Joanna Cone, Michael and Kimberly Aftosmes, and Don and Sheila Sanders.  However, all of the named Plaintiffs replaced all of the tanks in their home, regardless of whether those tanks cracked or caused real and/or personal property damage.  Thus, all named Plaintiffs sought compensation for all of the costs associated with inspection, replacement, delivery, and installation of the new tanks they purchased.  Additionally, each of the named Plaintiffs sought compensation for the cost of removal and disposal of their allegedly defective toilets.   As to the eleven Plaintiffs that experienced spontaneous cracking of at least one of their tanks and subsequent water leakage, these Plaintiffs also sought compensation for the damages they suffered to their real and/or personal property.

None of the three complaints ever provided an exact monetary amount for the damages that the named Plaintiffs were alleged to have suffered due to Defendant's toilet tanks.  Nor did any of the three complaints ever request an exact monetary amount for damages that were incurred by the

proposed class members.

All seventeen of the named Plaintiffs settled their claims with Defendant and received some form of compensation for releasing their individual claims.

## IV.   Class Certification

Plaintiffs sought class certification on a number of occasions.  On April 30, 2018, Plaintiffs filed their first motion for class certification based on the allegations in the Operative Complaint. Specifically, Plaintiffs sought certification of the following classes:

### *NATIONAL CLASS UNDER 23(B)(3) – Count I: STRICT PRODUCTS LIABILITY*

**COUNT I: STRICT PRODUCTS LIABILITY ADMISSIONS CLASS.**

*All current owners of Vortens toilet tank models #3464 or #3412 with a manufacturing date 2011-2012, and*

*All prior owners of Vortens toilet tank models #3464 or #3412 with a manufacturing date 2011-2012 that incurred expenses for property or mitigation damages*

**COUNT I: STRICT PRODUCTS LIABILITY RESTATEMENT CLASS.**

*Owners excluded from the Strict Product Liability Admissions Class that*

> *Currently own a Vortens toilet tank model #3464, #3412, #3404, #3425, or #3436 with a manufacturing date 2004-2012, and*

> *Previous owners of Vortens toilet tank models #3464, #3412, #3404, #3425, and #3436 with a manufacturing date 2004-2012 that incurred expenses for property or mitigation damages*

### *TEXAS CLASS UNDER 23(B) – Counts II-IV*

**COUNT II: IMPLIED WARRANTY CLASS**

*Currently own a Vortens toilet tank model #3464, #3412, #3404, #3425, or #3436 with a manufacturing date 2004-2012, and*

*Previous owners of Vortens toilet tank models #3464, #3412, #3404, #3425, and #3436 with a manufacturing date 2004-2012 that incurred expenses for property or mitigation damages.*

**COUNT III: NEGLIGENCE CLASS**

*Currently own a Vortens toilet tank model #3464, #3412, #3404, #3425, or #3436 with a manufacturing date 2004-2012, and*

*Previous owners of Vortens toilet tank models #3464, #3412, #3404, #3425,*

14

> *and #3436 with a manufacturing date 2004-2012 that incurred expenses for property or mitigation damages.*

**COUNT IV: DECEPTIVE TRADE PRACTICES ACT CLASS**

> *Currently own a Vortens toilet tank model #3464, #3412, #3404, #3425, or #3436 with a manufacturing date 2004-2012, and*

> *Previous owners of Vortens toilet tank models #3464, #3412, #3404, #3425, and #3436 with a manufacturing date 2004-2012 that incurred expenses for property or mitigation damages.*

(Dkt. #111 at pp. 13–14).  However, before the Court ruled on the motion, and after a full evidentiary hearing and three mediation conferences, the parties reached a partial settlement regarding tank models #3412 and #3464 that were manufactured in the year 2011 (the "2011 Settlement").

As part of the 2011 Settlement, the parties agreed on a class of individuals specific to the 2011 Settlement: all persons in the United States and its territories who purchased, or acquired through the purchase of a home, residence, or structure, a Vortens tank manufactured between January 1, 2011, and December 31, 2011, and bearing the model number #3412 or #3464. Noticeably, this class was not narrowed to one specific manufacturing plant and included any model #3412 and #3464 tanks manufactured in 2011, regardless of where tanks were manufactured.  Because of the 2011 Settlement, the Court denied the motion for class certification as moot and ordered Plaintiffs to file a new motion seeking class certification of the remaining claims.

On November 19, 2018, Plaintiffs filed a second motion for class certification, taking into account the 2011 Settlement.  In this new motion, Plaintiffs sought certification of a class of all Texas owners of a Vortens toilet tank model #3464, #3412, #3425, or #3436 with a manufacturing date between 2007 and 2012 that experienced property damage after spontaneous tank fracture for Counts I–IV and all owners of a Vortens toilet tank model #3464, #3412, #3425, or #3436 with a

manufacturing date between 2007 and 2012 for specific equitable relief without geographic limitations.  In the alternative, Plaintiffs sought certification of liability issues.  Plaintiffs did not seek certification of tank model #3404.

Originally, Plaintiffs sought certification of a class including models #3425 and #3436.  However, the class was narrowed to just those model #3412 and #3464 tanks owned by Texans which were manufactured between 2007 and 2010 at the Benito Juarez plant, rather than at both plants.  The class was narrowed after concerns were raised regarding the manufacturing plant for model #3436 and the manufacturing years for model #3425.

On September 4, 2019, after extensive briefing and a hearing on the issue, the Honorable Magistrate Judge Johnson entered a report and recommendation defining the scope of the certified class and giving preliminary certification to certain equitable issues.  The Court entered its memorandum opinion and order adopting the report and recommendation and certifying the class on September 26, 2019.  After the class certification, the parties entered into another settlement agreement (the "Texas Settlement"), which disposed of all remaining claims and defined the class as the Court defined it in its order on September 26, 2019.

## V.    The Settlement Agreements

The parties settled the case in multiple parts.  Outside of the two main settlement agreements, several individual Plaintiffs settled their claims against Defendant.  First, Steven and Joanna Cone and Michael and Kimberly Aftosmes entered into a settlement agreement with Defendant and their individual claims were dismissed from the lawsuit on December 29, 2017.  Next, Don and Sheila Sander entered into a settlement agreement with Defendant and their individual claims were dismissed from the lawsuit on June 1, 2018.  Thus, after June 1, 2018, only the class action claims and individual claims brought by Mark and Amber Fessler, Andrew Hocker,

16

Kevin Reuss, Matthew Carreras, Charles and Michelle Handly, Aaron and Stacey Stone, and Daniel and Sharon Sousa remained.

As to the class action claims and the remaining named Plaintiffs' claims, there are two relevant settlement agreements.  The first settlement agreement, the 2011 Settlement, provided benefits to all owners of model #3412 or #3464 tanks which were manufactured in the year 2011 who had previously repaired or replaced tanks, had tanks that needed to be repaired or replaced, or had tanks that may in the future manifest the alleged defect and need to be repaired or replaced. The second settlement agreement, the Texas Settlement, provided benefits to Texas owners of models #3412 or #3464 that were manufactured in the years 2007 through 2010 at the Benito Juarez plant.

### A.  The 2011 Settlement

After a mediation conference on August 28, 2018, the parties reached a partial settlement agreement.  Claims were settled with respect to past and current owners of models #3412 or #3464 that were manufactured between January 1, 2011, and December 31, 2011, who had already paid to have their tanks repaired or replaced.  After another mediation conference on October 16, 2018, the parties further resolved claims brought by owners of tank models #3412 or #3464 that were manufactured between January 1, 2011, and December 31, 2011, who had incurred property damage other than to the tanks themselves.  Accordingly, under the 2011 Settlement, Defendant must provide certain monetary and non-monetary benefits to all owners of model #3464 or #3412 tanks which were manufactured between January 1, 2011, to December 31, 2011.

In exchange for the benefits of the 2011 Settlement, the plaintiffs and class representatives to the 2011 Settlement (defined by the 2011 Settlement as Charles and Michelle Handly and Kevin Reuss) and any 2011 Settlement class members agreed to release, acquit, and discharge Defendant

17

from any present or future claims that Charles and Michelle Handly, Kevin Reuss, or the 2011 Settlement class members may have which are related to or arise from Defendant's tank models #3412 or #3464 that were manufactured in the year 2011, regardless of whether those claims were actually alleged in the current lawsuit.  Additionally, the 2011 Settlement releases, acquits, and discharges Defendant from any act, omission, damage, matter, cause, or event arising out of the initiation, defense, or settlement of the lawsuit, including damages for out-of-pocket expenses, diminution in value, benefit of the bargain, or cost of repair or replacement.[6] Defendant did not accept any liability for the allegations settled and released in the 2011 Settlement and continues to deny all claims against it.

Beyond the benefits espoused by the 2011 Settlement, Charles Handly, Michelle Handly, and Kevin Reuss received "Service Awards" of $7,500.00 to compensate them for their efforts in pursuing litigation on behalf of the 2011 Settlement class.

The 2011 Settlement does not release Defendants from liability regarding the individual claims of Plaintiffs who were not part of the 2011 Settlement.  Nor does the 2011 Settlement release Defendant from claims related to tank models #3464 and #3412 manufactured outside of the year 2011 or claims related to any of the tank models #3404, #3425, and #3436.

### 1.   2011 Settlement Class Members

A claimant is not entitled to the full benefit of the 2011 Settlement if he or she does not prove membership in the 2011 Settlement class.  The burden is on the claimant to prove that he or she is a member to the 2011 Settlement class.  On top of proving membership in the class, claimants must also prove they are part of the subclass for which they are seeking the benefit of.

---

[6] It is important to note that, although the release language in the 2011 Settlement includes attorneys' fees, Defendant is not actually released from paying attorney's fees based on the 2011 Settlement.  In fact, under the 2011 Settlement, Defendant is specifically liable for Class Counsel's attorneys' fees in an amount to be determined by the Court.

The settlement class includes all persons in the United States and its territories who purchased a model #3412 or #3464 tank manufactured in 2011 or acquired a model #3412 or #3464 tank manufactured in 2011 as part of the purchase of a home, residence, or structure.  Excluded from the class are officers, directors, and employees of Porcelana or its parents, subsidiaries, or affiliates, insurers of the 2011 Settlement class members, subrogees or all entities claiming to be subrogated to the rights of a purchaser or owner of a model #3412 or #3464 tank manufactured in 2011 or a 2011 Settlement class member, and issuers or providers of extended warranties or service contracts for the tank models #3412 or #3464 manufactured in 2011.  Furthermore, an individual is not considered a 2011 Settlement class member, even if he or she fits in the 2011 Settlement class definition, if he or she opts-out of the class.

Claimants may prove class membership by providing a valid tank model number and manufacturing year, i.e., evidence that the tank is a model #3412 or #3464 that was manufactured in the year 2011.  Claimants who do not submit proof of class membership are only entitled to limited compensation or benefits pursuant to an accepted declaration executed under oath.

### 2. Claim Forms

A member of the 2011 Settlement class has a "valid claim" when he or she timely submits a claim form completed in accordance with the provisions of the 2011 Settlement and preliminary approval order and which is signed and certified as being true and correct to the best of the claimant's knowledge and recollection.  Additionally, a valid claim must contain all the attestations, certifications, information, and documentation required to receive the requested benefit.  Similar to class membership, a class member must timely submit a properly completed claim form to the settlement administrator as a prerequisite to receiving any benefit under the 2011 Settlement.  If a class member does not timely submit a properly completed form to the settlement

19

administrator, then he or she is not entitled to the benefits of the 2011 Settlement.  The notice period for the 2011 Class Administration started May 16, 2019, and claimants had 18 months, until November 16, 2020, to submit claims.[7]

### 3.   Replacement and Installation Group Benefits[8]

A 2011 Settlement class member is considered part of the "Replacement and Installation" subclass if he or she is an owner of a Vortens tank model #3412 or #3464 manufactured between January 1, 2011, and December 31, 2011, that (1) has not cracked; or (2) has not experienced a crack from which no other property damage occurred.

### a.   Reimbursement

Claimants who are members of the "Replacement and Installation" subclass, and who have not already been paid by a direct claim to Porcelana, are entitled to reimbursement of up to $300 per tank, inclusive of replacement and installation.  Claimants seeking to prove a prior replacement must submit sufficient documentary evidence.   Sufficient documentary evidence includes photographs, service tickets, service receipts, copies of checks, or credit card statements.

All individuals seeking the benefits of the "Replacement and Installation Group" must

---

[7] Although the 2011 Settlement provides that all claims for the "Damages Group" must be made within 135 days of the final approval of the 2011 Settlement and all claims for the "Replacement and Installation Group" must be made within twelve months from the notice date, the parties agree that the above dates and claim period are true and accurate.

[8] The Court notes that the requirements for proving class membership, a prerequisite to being able to recover any benefits under the 2011 Settlement, overlap with some of the requirements for receiving reimbursement as part of the "Replacement and Installation Group."  To clarify, an individual may prove class membership by showing that he or she either purchased a model #3412 or #3464 tank manufactured in 2011 or acquired a model #3412 or #3464 tank manufactured in 2011 as part of the purchase of a home, residence, or structure.  Once an individual proves they are a member of the 2011 Settlement class, then the individual may recover benefits under one of the two groups.  If an individual seeks to recover under the reimbursement section of the "Replacement and Installation Group," then that individual must prove either home building year or home ownership.  Thus, an individual seeking reimbursement costs under the "Replacement and Installation Group" must do more than simply submit a tank model number and manufacturing year; an individual seeking reimbursement costs under the "Replacement and Installation Group" must also provide proof of either the home building year or home ownership.  If, on the other hand, a member of the "Replacement and Installation Group" is seeking the benefit of the "Distribution Center Program," then he or she is not required to provide proof of home ownership or building year and may, instead, choose to only provide proof of the tank model number and manufacture date.

provide receipts for the cost of installation and provide proof of home building year or ownership. However, it is not necessary to provide receipts for the cost of replacement.  If a claimant does not have receipts to support their claim for replacement costs, then the 2011 Settlement allows the claimant to submit a declaration instead.  Thus,  there are two categories of individuals who may benefit under this section: (1) those who have receipts to support their claim for replacement costs and the installation costs, as well as proof of home building year or ownership, and (2) those who have proof of home building year or ownership, receipts to support their claim for installation costs, and a sworn declaration to support their claim for replacement costs.

Whether a claimant has replacement receipts or not affects the reimbursement amount. Claimants who can support their reimbursement request with receipts for the cost of installation and replacement are entitled to up to $300 per replacement tank and installation.  If a claimant does not have receipts to support his or her claimed cost of replacement, and instead provides a declaration, then the claimant is only entitled to reimbursement of up to $150 per tank.

### b.  Distribution Program

As part of the "Replacement and Installation" subclass, claimants may elect to participate in a "Distribution Center Program" instead of receiving reimbursement for the cost of replacing and installing a new toilet tank.  To receive a replacement tank through the "Distribution Center Program," 2011 Settlement class members need only reside within a 100-mile radius of a designated distribution center.   Unlike those seeking reimbursement, a claimant seeking replacement under the distribution program need not provide proof of home building year or ownership.  Instead, simply providing proof of the tank model number and manufacture date, as well as living within a 100-mile radius of a designated distribution center, is sufficient to receive the benefit of the "Distribution Center Program."

According to the 2011 Settlement, Defendant is required to provide replacement tanks to distributors in designated geographic areas where tanks were distributed in 2011.  Those geographic areas encompass parts of Texas, Louisiana, California, and Florida.  Defendant must continue this program as needed through the conclusion of the claim period, November 16, 2020.

### c.   Warranty Extension

Furthermore, a member of the "Replacement and Installation Group" who is not seeking reimbursement costs or replacement of their tank nonetheless receives the benefit of an extended warranty.  The 2011 Settlement extended the warranty of tank models #3412 and #3464 manufactured in 2011 for individuals who have not already replaced their tank and do not elect to replace their tanks during the claim period.

Any 2011 Settlement class members who have previously received a replacement tank from Porcelana which was contingent on executing a warranty waiver received a warranty extension as well.  Defendant extended these warranties for five years from the date of the release.

### 4.   Damages Group Benefits

A 2011 Settlement class member is considered part of the "Damages" subclass if (1) he or she is an owner of a Vortens tank model #3412 or #3464, (2) that was manufactured between January 1, 2011, and December 31, 2011, (3) that fractured between the date of manufacture and the date of certification, (4) if the fracture resulted in property damage.  Individuals who are part of the "Damages" subclass are entitled to recover out-of-pocket expenses incurred as a result of the cracked or broken tank, so long as Porcelana has not previously paid on their claims pursuant to a signed release.

Claimants are entitled to reimbursement of actual out-of-pocket expenses up to $4,000 if they provide sufficient documentary proof of ownership and expenses.  The burden is on claimants

to prove the fact of a repair, the amount of out-of-pocket expenses incurred, that claimant actually paid the amount incurred out-of-pocket, and ownership.  If the documentary proof provided by claimant is insufficient to demonstrate that a repair in fact occurred, then the claimant is not entitled to any of the benefit for which such proof is required.

The 2011 Settlement does not indicate whether claimants must provide proof of home ownership or proof of tank ownership.  However, based on the other provisions and definitions in this section, the ownership requirement may be met when a claimant proves either ownership of the home or ownership of the tank.  Regardless of which type of ownership claimants chooses to prove, the claimant must provide sufficient documentary evidence to support his or her claim of ownership.

A claimant can provide "documentary proof of ownership and expenses" in several ways. Sufficient documentary proof, generally, includes photographs, service receipts, service tickets, credit card statements, or copies of checks.  Furthermore, claimants entitled to the damage group benefits may submit proof of expenses by way of receipts, invoices, insurance claim records, sufficient banking or credit purchase records, or expenditure documents.  And a claimant entitled to the damage group benefits may provide proof of ownership by means of home purchase documents, installer records, builder records, deed information, or qualifying photographic proof of tank ownership.

If a claimant does not have the sufficient documentary proof to support his or her claimed expenses, then the claimant is only entitled to reimbursement for replacement expenses incurred up to $150 per tank.  Before the claimant can recover the $150, however, the claimant must submit a signed declaration under oath attesting to the damages and payment details.  In addition, the declaration must still be accompanied by documentary proof of ownership.

### 5.  Notices

After running each address of record in Defendant's databases through the National Change of Address database, the settlement administrator must mail a "Summary Notice" to each address of record in Defendant's databases.  If notices are returned with a forwarding address, then the settlement administrator must forward those notices to the address provided.  The settlement administrator must also send emails to each member of the Equitable Relief Class for whom a valid email address is known to Defendant.  Additionally, the settlement administrator must provide notice through media outlets and provide a copy of the claim form to any 2011 Settlement class members who request a hardcopy.

If the settlement administrator determines that a claim is invalid and, therefore, denies it, the settlement administrator must send a "Notice of Claim Denial," i.e., a written notice which identifies the reason the settlement administrator denied the claim. The claimant will have thirty days to respond.  Additionally, if the settlement administrator foresees denying a claim on the basis of insufficient documentary proof, then the settlement administrator is required to send written notice of the deficiency to the claimant and identify the insufficient documentary proof that may cause the claim to be denied.  The settlement administrator may provide the claimant up to 30 days to cure the deficiency.

### 6.  Attorneys' Fees

Under the 2011 Settlement, Class Counsel is entitled to attorneys' fees and costs in an amount determined by the Court.

### B.  The Texas Settlement

On November 21, 2019, the parties entered into a Memorandum of Understanding of Settlement (the "Memorandum"), which outlined a proposed settlement between the parties.  On

December 10, 2019, Defendant and certain named Plaintiffs, Daniel and Sharon Sousa and Aaron and Stacey Stone, entered into a second settlement agreement, the Texas Settlement, on behalf of themselves and the Texas Settlement class members pursuant to the Memorandum.  The Texas Settlement resolved all remaining claims in the lawsuit.

The Texas Settlement provides relief to all Texas owners of model #3412 or #3464 tanks that were manufactured between January 1, 2007, and December 31, 2010, at the Benito Juarez plant.  Under the Texas Settlement, Defendant must provide certain monetary and non-monetary benefits in the form of equitable and incidental relief to eligible settlement class members. Additionally, the Memorandum and Texas Settlement, in part, specifically address the resolution of the remaining individual named Plaintiffs' claims.

In exchange for the benefits enumerated in the Texas Settlement, Aaron and Stacey Stone and Daniel and Sharon Sousa, on behalf of themselves and the Texas Settlement class members they represent, agreed to release, relinquish, and discharge Defendant from any present or future claims for warranty, equitable relief, declaratory relief, and injunctive relief based on facts that were or could have been alleged in the Operative Complaint.

Likewise, Aaron and Stacey Stone and Daniel and Sharon Sousa, as Texas Settlement class representatives, on behalf of themselves and the other individually named Plaintiffs Mark and Amber Fessler, Andrew Hocker, and Matthew Carreras, agreed to settle and release their individual claims that they did bring or could have brought in the Operative Complaint in exchange for monetary compensation.  Thus, after the Texas Settlement, there were no claims remaining against Defendant.

### 1.  Plaintiffs and Class Representatives

The Texas Settlement class representatives are Aaron and Stacey Stone and Daniel and

Sharon Sousa.  Under the Texas Settlement, Aaron and Stacey Stone and Daniel and Sharon Sousa are entitled to a "Service Award" of $7,500.00 to compensate them for their efforts in pursuing litigation on behalf of the Texas Settlement class.

The Texas Settlement plaintiffs include the class representatives for the Texas Settlement, as well as Mark and Amber Fessler, Andrew Hocker, and Matthew Carreras.

The plaintiffs to the Texas Settlement fully released their individual claims as follows:

1. Aaron and Stacey Stone agreed to fully release their individual claims against Defendant in exchange for $6,890.12;

2. Daniel Sousa agreed to fully release his individual claims against Defendant in exchange for $6,697.00;

3. Mark and Amber Fessler agreed to fully release their individual claims against Defendant in exchange for $4,599.78;

4. Andrew Hocker agreed to fully release his individual claims against Defendant in exchange for $720.53; and

5. Matthew Carreras agreed to fully release his individual claims against Defendant in exchange for $2,664.00.

While the Texas Settlement terms fully settled and released the Texas Settlement class representatives' claims against Defendant, the Texas Settlement is not the operative document of the other plaintiffs' individual claims against Defendant.  The Texas Settlement only addresses the claims of the other above-named Plaintiffs and notes that those Plaintiffs have agreed to settle their claims.  Mark and Amber Fessler, Andrew Hocker, and Matthew Carreras each entered into their own separate written agreements, signed by themselves and Defendant, in which Defendant contractually agreed to pay Mark and Amber Fessler, Andrew Hocker, and Matthew Carreras an

amount of money to compensate them for the alleged damage they suffered due to the toilet tanks Defendant manufactured.  However, the Texas Settlement is the operative document for the release of all remaining causes of action against Defendant after the 2011 Settlement.  The Texas Settlement fully disposed of the lawsuit against Defendant and no claims remained after the Texas Settlement became effective.

### 2.  Claim Forms

A valid claim is a claim form that is timely submitted by a Texas Settlement class member in accordance with the Texas Settlement and preliminary approval order and for which the claimant signed a certification attesting that the information is true and accurate to the best of the claimant's knowledge and recollection, and which is accompanied by all proper attestations, certifications, information, and documentation.  To receive any of the benefits provided by the Texas Settlement, claimants must timely submit a completed claim form to the settlement administrator.  If a claimant does not timely submit a properly completed form, then he or she is not entitled to compensation under the Texas Settlement.

### 3.  Texas Settlement Class Members

The Texas Settlement class includes all Texas owners who purchased a model #3412 or #3464 tank manufactured between 2007 and 2010 at the Benito Juarez manufacturing plant or acquired a model #3412 or #3464 tank manufactured between 2007 and 2010 at the Benito Juarez manufacturing plant as part of the purchase of a home, residence, or structure.  Excluded from the class are (1) officers, directors, and employees of Porcelana or its parents, subsidiaries, or affiliates, (2) insurers of the Texas Settlement class members, (3) subrogees or all entities claiming to be subrogated to the rights of a purchaser or owner of a model #3412 or #3464 tank manufactured between 2007 and 2010 at the Benito Juarez manufacturing plant or a Texas

Settlement class member, and (4) issuers or providers of extended warranties or service contracts for the tank models #3412 or #3464 manufactured in 2011.

More specifically, the Texas Settlement provides for an "Equitable Relief Class." Only those persons who fall within the definition of the Equitable Relief Class are considered Texas Settlement class members. The Equitable Relief Class includes all Texas owners of a Vortens toilet tank models #3412 and #3464 manufactured at the Benito Juarez plant, with a manufacturing date 2007 to 2010. Essentially, the Equitable Relief Class and the overarching Texas Settlement class are the same; the Equitable Relief Class is a simplified definition of the Texas Settlement class.

### 4. Texas Settlement Class Benefits

The Texas Settlement provides benefits upon submission of a timely and completed claim form that meets all the requirements of the Texas Settlement by December 31, 2020. A claimant who submits a claim form after December 31, 2020, is not eligible for the benefits of the Texas Settlement, even if they are a member of the Equitable Relief Class.

The Texas Settlement, on its face, provides two kinds of benefits to members of the Equitable Relief Class: (1) injunctive relief and (2) declaratory relief. All members of the Equitable Relief Class are entitled to the benefit of both the injunctive and declaratory relief. However, portions of these two kinds of benefits clearly encompass monetary compensation.

### a. Injunctive Relief

The Texas Settlement provides that Equitable Relief Class members are entitled to injunctive relief. To start, Equitable Relief Class members are entitled to multiple notices from Defendant. First, Defendant had to provide notice on its website that tank models #3412 and #3464 manufactured between January 1, 2007, and December 31, 2010, at the Benito Juarez Plant, are

guaranteed to Texas owners to be free of manufacturing defects or ceramic defects up through and including December 31, 2020.  Next, Defendant had to further provide notice on its website directing Equitable Relief Class members to the claim website maintained by the settlement administrator for administration of their warranty claims.

The injunctive relief agreed to under the Texas Settlement also required Defendant to perform an audit.  Specifically, Defendant had to conduct an audit of previously denied warranty claims that fell within the defined scope of the Equitable Relief Class. Defendant had to provide a list of homeowners with available contact information to the settlement administrator for the purpose of direct notice to these prior claimants that their previously denied warranty claim is subject to resubmission and reconsideration.

Additionally, the settlement administrator is required to maintain a Texas Settlement website that will post an agreed Texas Settlement class claim form specific to claims asserted pursuant to the Texas Settlement from January 17, 2019, until December 31, 2020.  Lastly, the Texas Settlement enjoined Defendant from creating, implementing, or requiring any additional elements of proof in the claim process different than those articulated in the Texas Settlement.

### b.  Declaratory Relief

The Texas Settlement also provides that Equitable Relief Class members are entitled to declaratory relief.  Defendant was required to guarantee to Texas owners that models #3412 and #3464 manufactured between January 1, 2007, and December 31, 2010, at the Benito Juarez plant are free of manufacturing defects or ceramic defects.  Defendant also had to extend the warranty protections to the Equitable Relief Class members through December 31, 2020.

Additionally, Equitable Relief Class members who have experienced a fracture of their tank model #3412 or #3464 manufactured between January 1, 2007, and December 31, 2010, at

the Benito Juarez plant may submit a warranty claim or resubmit a previously denied warranty claim.  To submit a warranty claim, or resubmit a previously denied warranty claim, for a tank fracture that occurred in the past, a claimant must provide proof of ownership of a model #3412 or #3464 tank which was manufactured between January 1, 2007 and December 31, 2010 at the Benito Juarez plant and submit documentary proof of his or her replacement costs.  If a claimant submits proof of ownership and replacement costs, then the claimant is entitled to recover product replacement costs in an amount up to $300 per tank.  In this case, replacement costs means the cost of the replacement product and the cost of installation.

Sufficient documentary proof of ownership includes home purchase documents, installer records, builder records, deed information, and qualifying photographs demonstrating proof of tank ownership.  As to expenses, sufficient documentary proof includes records such as receipts, invoices, insurance claim records, sufficient banking or credit purchase documents, or expenditure documentation.  If a claimant cannot support his or her claim for reimbursement with the above enumerated documents, then the claimant is not entitled to reimbursement for the replacement costs of their previously fractured tank.

Lastly, Equitable Relief Class members who experience a fracture between the date of notice of the Texas Settlement and December 31, 2020, of their tank model #3412 or #3464 manufactured between January 1, 2007, and December 31, 2010, at the Benito Juarez plant are entitled to a replacement tank at no cost.  To receive this benefit, a claimant must submit proof of the fracture.  Once a claimant provides proof of the fracture, then Defendant must provide a replacement tank that is compatible with the claimant's toilet basin.

If a compatible replacement tank is available within thirty miles of the claimant's residence, then the claimant may pick up the toilet tank.  If, however, a replacement tank is not

available within thirty miles of the claimant's home, then the claimant is entitled to a single payment of $35 for the replacement of the fractured tank.

If the claimant's original basin is incompatible with Defendant's current tank products and claimant must replace the entire toilet—basin and tank—then the claimant is entitled to reimbursement of the replacement expenses claimant incurred in an amount up to $300.  To receive the replacement reimbursement, a claimant must submit documentary proof of what his or her replacement costs were and an explanation as to why no compatible tank was available.

### 5.  Notices

After running each address of record in Defendant's databases through the National Change of Address database, the settlement administrator must mail a "Summary Notice" to each address of record in Defendant's databases.  Additionally, the settlement administrator must send emails to each member of the Equitable Relief Class for whom a valid email address is known to Defendant.

Furthermore, if the settlement administrator determines that a claim is invalid and, therefore, must be denied, the settlement administrator must send a "Notice of Claim Denial" to the claimant.  If Class Counsel is challenging the claim denial, however, then the settlement administrator is not required to send the notice.  The claimant will have thirty days to respond to the notice.  And, before denying a claim on the basis of insufficient documentary proof, the settlement administrator is required to send written notice of the deficiency to the claimant and identify the insufficient proof that may cause the claim to be denied.  The settlement administrator may provide the claimant up to thirty days to cure the deficiency.

### 6.  Attorneys' Fees

Under the Texas Settlement, Class Counsel is entitled to attorneys' fees and costs in an

amount determined by the Court.

## CONCLUSIONS OF LAW

### I.      Manufacturing Defects

A manufacturing defect is limited to the location of the manufacturer.

### II.     Successful and Unsuccessful Claims

Throughout the litigation, the lawsuit has centered around the same causes of action—strict products liability, breach of implied warranties of merchantability and fitness for a particular purpose, negligence, and violations of the DTPA.  However, the named Plaintiffs, tank models, requests for relief, and proposed class members have changed as amended complaints were filed and settlements were reached.  Collectively throughout this litigation, seventeen named Plaintiffs brought five causes of action, and claims for injunctive and declaratory relief, regarding seven toilet models manufactured during a nine-year period, with no geographic limitations, on behalf of themselves and four variations of proposed classes and two proposed subclasses.  In the end, each of the named Plaintiffs settled all of their individual claims against Defendant and also settled claims on behalf of themselves and the members of two subclasses of the proposed classes regarding two tank models manufactured across five years and limited, in part, to a single manufacturing plant.

It is axiomatic that there is a disparity between the relief requested and the relief received. It is clear that claims regarding tank models #3404, #3425, #3408, and #3571, regardless of the year, were unsuccessful.  No part of any settlement agreement provides relief or benefits to any owners of these four tanks.  Furthermore, none of the named Plaintiffs owned or brought claims regarding any of those seven toilets.  It is also clear that Plaintiffs requested, but did not receive, punitive or statutory damages.  Plaintiffs did, however, receive some monetary, declaratory, and

injunctive relief regarding tank models #3412 and #3464.  Albeit, not for every year Plaintiffs requested.  Additionally, a single plaintiff, Andrew Hocker, received monetary compensation for his claims regarding tank model #3436 and six other named Plaintiffs—Steven and Joanna Cone, Michael and Kimberly Aftosmes, and Don and Sheila Sander—settled their individual claims with Defendant for tanks manufactured in years outside the scope of the 2011 and Texas Settlements.

At all times since the inception of this litigation, Plaintiffs have brought claims for relief regarding tank models #3412 and #3464.  Plaintiffs were partially successfully on their claims regarding models #3412 and #3464.  However, Plaintiffs were entirely unsuccessful on their claims regarding models #3412 and #3464 insofar as those claims relate to the years 2004 and 2005.  Plaintiffs were only somewhat unsuccessful on their claims regarding model #3464 insofar as those claims relate to the years 2006 and 2012 because some named Plaintiffs brought and settled individual claims for those years.  Further, Plaintiffs were entirely unsuccessful on their claims regarding models #3412 and #3464 insofar as those claims relate to tanks manufactured between January 1, 2007, and December 31, 2010, but which are not owned by a Texas resident or were not manufactured at the Benito Juarez plant.

Regarding tank models #3412 and #3464 manufactured in the year 2011, as they relate to the named Plaintiffs and the proposed nationwide class, Plaintiffs brought causes of action for strict products liability, breach of the implied warranties of merchantability and fitness for a particular purpose, and negligence.  Plaintiffs requested in the Operative Complaint that the Court award appropriate monetary damages to Plaintiffs and the proposed class members in an amount equal to the amount needed to remediate damaged premises or otherwise mitigate the risk of additional damages.  Plaintiffs, though, did not enumerate what that amount may be.  Also, relevant here are Plaintiffs' requests that the Court issue an injunction requiring Defendant to notify all

33

class members that they are entitled to submit an initial, additional, or supplemental request for payment in connection with prior loss and/or damage to their structures and/or premises.

Although there was no requirement that Defendant admit liability under any of these claims, members of the 2011 Settlement class, a subset of the nationwide class proposed by Plaintiffs, were successful on these claims for tank models #3412 and #3464 manufactured in the year 2011, regardless of where these tanks were manufactured.  To start, the 2011 Settlement class members did receive monetary relief.  Per the 2011 Settlement, 2011 Settlement class members were entitled to reimbursement for replacement and installation costs, as well as reimbursement for out-of-pocket expenses incurred as a result of damage to real or personal property caused by the cracking and leaking tanks.

Additionally, Plaintiffs were largely successful on their requests for injunctive and declaratory relief as those requests relate to the 2011 Settlement; namely, Plaintiffs' requests for payments for prior loss or damage and mitigation of the risk of additional damages.  As part of the 2011 Settlement, Defendant was required to replace 2011 Settlement Class members model #3412 or #3464 tanks manufactured in 2011 with a new toilet tank if the class members so requested. And a 2011 Settlement class member who did not elect to replace their tank, or who had previously executed a warranty waiver in order to receive a replacement tank, received the benefit of Defendant extending the warranty on their tanks.

Moreover, the 2011 Settlement required that the 2011 Settlement class members receive notice regarding their right to submit claims with respect to any of the tanks that were part of the 2011 Settlement.  Under the 2011 Settlement, class members were also entitled to receive certain notices indicating to those class members that they were entitled to submit claims under the settlement agreement and receive any benefits under the 2011 Settlement for which those class

34

members may be entitled.

Regarding tank models #3412 and #3464 owned by Texas residents and manufactured between January 1, 2007, and December 31, 2010, at the Benito Juarez plant, Plaintiffs brought causes of action in the Operative Complaint as to a breach of the implied warranties of merchantability and fitness for a particular purpose and violations of the DTPA, as well as requests for injunctive and declaratory relief.  Plaintiffs requested in the Operative Complaint that the Court award appropriate monetary damages to Plaintiffs and the proposed class members in an amount equal to the amount needed to remediate damaged premises or otherwise mitigate the risk of additional damages.  Again, though, no specific amount of monetary compensation was requested in any complaint.

There was some monetary relief with respect to tank models #3412 and #3464 owned by Texas residents and manufactured between January 1, 2007, and December 31, 2010, at the Benito Juarez plant.  This is true despite all the benefits of the Texas Settlement being labeled as either declaratory relief or injunctive relief.  Members of the Texas Settlement class were entitled to several differing kinds of monetary relief, depending on what category a class member fell under, in the form of reimbursement for replacement costs related to cracked tanks.  However, unlike in the 2011 Settlement, there was no compensation for any costs related to damaged property beyond the tank itself.

Regarding declaratory relief, under the Texas Settlement, Defendant was required to guarantee to Texas owners that the tanks-at-issue in the Texas Settlement are free from manufacturing defects or ceramic defects.  Defendant was further required to extend warranty protections to the Equitable Relief Class members through December 31, 2020.  Defendant had to provide notice on its website directing Equitable Relief Class members to the claim website

maintained by the settlement administrator for administration of their warranty claims.

Regarding injunctive relief, Defendant had to provide notice on its website that tank models #3412 and #3464 manufactured between January 1, 2007, and December 31, 2010, at the Benito Juarez Plant are guaranteed to Texas owners to be free of manufacturing defects or ceramic defects up through and including December 31, 2020.  Next, the injunctive relief agreed to under the Texas Settlement also required Defendant to perform an audit.  Specifically, Defendant had to conduct an audit of previously denied warranty claims that fell within the defined scope of the class. Defendant then had to provide a list of homeowners with available contact information to the settlement administrator for the purpose of direct notice to these prior claimants that their previously denied warranty claim is subject to resubmission and reconsideration.  Additionally, the settlement administrator is required to maintain a Texas Settlement website that will post an agreed Texas Settlement Class claim form.

The program that Defendant put into place prior to litigation does not entirely detract from the success of the claims regarding tank models #3412 and #3464 for the years 2007 through 2011. Under the replacement program, anyone with a model #3412 or #3464 tank that had cracked and caused damage to personal or real property received no monetary compensation.  Nor did this program provide any kind of warranty protection or monetary compensation for the costs and charges associated with replacement and installation of a new tank.  Additionally, this program provided no kind of declaratory or injunctive relief.  Not only do the two settlement agreements go far beyond Defendant's self-imposed replacement program, but they provided, at least in part, further relief to individuals who had participated in Defendant's self-imposed program.

Moreover, the degree of success of these claims is not encompassed by the number of claims filed, the number of claims granted, the number of claims denied, the current amount of the

payouts to claimants under the settlement agreements, or the precise number of toilet tanks which have or may be part of the two settlements.  Nothing in the Operative Complaint notates a specific number of toilet tanks, a specific number of proposed class members, or a specific amount of monetary payout sought for each named Plaintiff or individual class member, regardless of which class they are a member of.  Likewise, nothing in the Operative Complaint identifies that every proposed class member must or will have damage to their property beyond that of the cracked tank itself.  In fact, the Operative Complaint does not even go so far as to claim that every proposed class member would have a cracked tank, but rather that the proposed class members are owners of tanks that Plaintiffs claim have manufacturing defects and, therefore, could crack.

To ask the Court to compare the exact number of toilet tank replaced or amount of money received by named Plaintiffs and class members of the Texas and 2011 Settlements with the requests, claims, and theories outlined in the Operative Complaint is asking the Court to perform an impossible task.[9]

## III.     Prior Attorneys' Fees Order

In the Court's original order granting Class Counsel's request that the Court award attorneys' fees (Dkt. #285), the Court conducted analyses and made many determinations which were not disturbed by the Fifth Circuit's mandate.  The Court fully lays out its initial analysis and findings later in this order as part of its reconsideration of Class Counsel's attorneys' fees request.

---

[9] The Court acknowledges that the Fifth Circuit determined that the Court should give primary consideration to the amount of damages awarded as compared to the amount sought and noted that the Court could wait to conduct the inquiry until the comparison can be properly made.  *Fessler*, 23 F.4th at 419.  However, there will not come a point where the Court can properly compare the amount of monetary damages sought in the Operative Complaint to those awarded as part of the 2011 and Texas Settlements.  Indeed, there was no specific amount of monetary damages sought and the majority of Plaintiffs' requests for relief centered around injunctive and declaratory relief.  Moreover, the Fifth Circuit's mandate to this Court, at its core, simply requires that the Court make "factual findings regarding the nature of the Class's unsuccessful claims" and then re-examine its lodestar calculation based on those findings.  *See generally, id.*  The Court has reviewed the allegations and requests for relief and then compared those to what was received.  So, while the Court may not be able to compare monetary amounts sought with those received, the Court is still able to fulfill the Fifth Circuit's directive and compare the relief sought with what was actually received.

As to the remand mandate, the Fifth Circuit was clear that this Court must "address the 'common core of facts' and 'common legal theories' sufficiently so that no fees are awarded on unsuccessful theories" and that the Court must "consider the amount of damages and non-monetary relief sought compared to what was actually received by the Class." *Fessler*, 23 F.4th at 419.  The Court's above findings of fact and conclusions of law lay out in detail which claims and theories were brought and what benefits were received.

**OBJECTIONS AND SUPPLEMENTAL FINDINGS**

To start, the Court will grant Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Leave to File Exhibit to Proposed Findings of Fact (4:17-cv-1 Dkt. #356) based on the Court's order granting the identical motion in the corresponding docket (4:19-cv-248 Dkt. #114). Here, as was the case in the corresponding docket, Class Counsel's response clarifies that they do not actually oppose Defendant's requested relief.  So, considering the agreement of the parties, and good cause having been shown, the Court determines the motion should be granted.

Aside from the above-mentioned motion, Class Counsel filed motions for leave to file supplements to their proposed findings of fact and conclusions of law, all of which have been opposed.  Class Counsel also filed objections to Defendant's sur-reply to Plaintiffs' motion for findings of fact and conclusions of law.  The substance of the supplements and the complained-of portions of Defendant's sur-reply brief all relate to facts and data which the Court did not consider when making its factual determinations and legal conclusions.  Because the Court did not use the supplemental briefing or Defendant's amended proposed findings of fact and conclusions of law attached to its sur-reply, these motions are moot.

**ATTORNEYS' FEES ORDER**

**I.      The Fifth Circuit's Mandate**

The Fifth Circuit reviewed this Court's original order awarding attorneys' fees and determined that the Court "erred in calculating the lodestar and in refusing to decrease it"  *See Fessler*, 23 F.4th at 416.  Specifically, the Fifth Circuit held that the Court abused its discretion when it failed to make any factual findings regarding the nature of Plaintiffs' successful claims and made unsupported assertions which were "insufficient to permit the district court to bypass the proper lodestar calculation and only consider the unsuccessful claims under the eighth *Johnson* factor." *Id.* at 416–18.  Accordingly, the Fifth Circuit determined that the Court should have made specific factual findings regarding Plaintiffs' overall success and only awarded attorneys' fees for time spent on successful claims as part of the Court's lodestar calculation.  *Id.*

Notwithstanding the Fifth Circuit's holding with respect to the Court's lodestar analysis, the Fifth Circuit also took issue with the Court's *Johnson* analysis.  *Id.* at 418–19.  According to the Fifth Circuit, the Court's analysis of the eighth *Johnson* factor fell short because the Court "failed to consider the amount awarded in relation to the amount sought."  *Id.* at 418.  Along that same vein, the Fifth Circuit noted that the "mere uncertainty about the actual monetary value obtained by the Class is no reason to duck the required inquiry."  *Id.* at 419.  Rather, the Fifth Circuit held that, if the "projections of future benefit to the Class are too fluid," the Court should have stayed its determination of attorneys' fees until a proper comparison could be made.  *Id.*

Accordingly, the Fifth Circuit remanded the issue back to the Court for further proceedings so that the Court may make factual findings regarding the nature of the unsuccessful claims and then, if necessary, adjust the lodestar based on those findings.  *Id.* at 419.  In making those adjustments, the Fifth Circuit directed the Court to "consider the amount of damages and non-

monetary relief sought compared to what was actually received."  *Id.*

## II.     Attorneys' Fee Award

As the Court noted in its prior order on attorneys' fees in this case, under Federal Rule of Civil Procedure 23(h), "[i]n a certified class action, the Court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement" (Dkt. #285 at p. 4).  Courts within the Fifth Circuit use a two-step method to determine reasonable attorneys' fees: (1) calculation of a base lodestar amount; and (2) application of the *Johnson* factors to enhance or decrease the lodestar amount.  *See In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) (quoting *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998)).

To calculate the lodestar, a court must determine the reasonable number of hours spent on the litigation and the reasonable hourly rate.  *Id.*  Courts then multiply the reasonable hourly rate by the reasonable hours expended.  *Id.*  The resulting number represents the base lodestar.  *Id.* After calculating the lodestar, the Court "must scrutinize a fee award under the [twelve *Johnson*] factors . . . ."  *Id.* (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). The Court does not need to be "meticulously detailed" in its *Johnson* analysis, but it must articulate and apply the correct criteria.  *Id.*  (quotations omitted).  And, although the lodestar is presumed reasonable, the Court may enhance or decrease it after evaluating the twelve *Johnson* factors.  *E.g.,* *Combs v. City of Huntington*, 829 F.3d 388, 392 (5th Cir. 2016).

Initially, Class Counsel submitted that the proper lodestar was $4,388,405.50 and argued that a multiplier of 2.9 based on the *Johnson* factors was warranted (Dkt. #275 at pp. 11, 17). Defendant took exception with all of Class Counsel's calculations, arguing specifically that Class Counsel improperly sought fees for hours expended on unsuccessful claims and improperly asked

for the Court to apply a multiplier (Dkt. #266 at pp. 5–6).  Additionally, Defendant asked the Court

to reduce the attorneys' fee award in both the initial lodestar calculation and under the *Johnson*

factors.  According to Defendant, a reduction was necessary based on Plaintiffs' limited success.

*Compare* (Dkt. #277 at pp. 8–12) ("A reasonable fee award is 6.25% of Plaintiffs' attorneys'

reasonable and necessary time, billed at a reasonable hourly rate, for work from [January 18, 2018–

November 19, 2018] . . . .  A reasonable fee award is 11.76% of Plaintiffs' attorneys' reasonable

and necessary work, billed at a reasonable hourly rate, from [November 19, 2018–June 15,

2019],"), *with* (Dkt. #277 at pp. 28–29) ("As set forth in Section I, Plaintiffs had limited

success . . . .  After calculating the lodestar, the Court then considers whether the circumstances of

the particular case warrant an upward or downward lodestar adjustment.") (quotations and citations

omitted) (emphasis in original).

The Court agreed with Class Counsel in part and Defendant in part, determining "that the

base lodestar [was] $4,333,949.50" (Dkt. #285 at p. 8).  The Court further determined, as part of

its lodestar analysis, that "it is difficult—if not practically impossible—to attempt to identify

specific hours that should be eliminated in a case like this where all claims shared a common core

of facts and were based on related legal theories" (Dkt. #285 at p. 7).  The Court concluded,

however, that consideration of Plaintiffs' success was better left for analysis under the *Johnson*

factors rather than in its initial lodestar calculation (Dkt. #285 at pp. 7–8).  Ultimately, after

applying the *Johnson* factors, the Court determined that no adjustment was necessary.

As required within the Fifth Circuit, the Court's lodestar calculation considered the

reasonable hourly rate and the reasonable hours expended and then multiplied those numbers

together.  With respect to hourly rates, the Court concluded that Class Counsel's submitted hourly

rates for the attorneys and paralegals who worked on this case were reasonable and proper based

on the Court's independent knowledge and expertise in attorneys' fees (Dkt. #285 at pp. 11–12). The Court further concluded that the hours expended, after a reduction to account for duplicative and unnecessary billing entries, were reasonable as well (Dkt. #285 at pp. 11–12).  Based on these conclusions, the Court calculated that the lodestar was $4,333,949.50 (Dkt. #285 at p. 14).

The Court's conclusions and calculations are reproduced in the following chart which reflects the individual time keepers, the rate at which those time keepers billed their hours, the total hours those time keepers actually billed, and the base lodestar amount after taking into consideration all the relevant analyses and factors, such as a reduction based on duplicative and unnecessary billing entries:

| Time Keeper | Rate | Total Hours | Base Lodestar |
|---|---|---|---|
| N. Scott Carpenter | $695 | (2890.6 – 36.3) = **2,854.3** | $1,983,738.50 |
| Rebecca Bell-Stanton | $675 | (3241.7 – 43.3) = **3,198.4** | $2,158,920.00 |
| Doug Heuval | $525 | 88.1 | $46,252.50 |
| Sabina Pincus | $425 | 82.4 | $35,020.00 |
| Anthony LaScalea | $300 | 21.1 | $6,330.00 |
| Veronica Negron | $140 | 93.0 | $13,020.00 |
| Enrica Peters | $140 | 65.4 | $9,156.00 |
| Bridget Holley | $125 | 652.1 | $81,512.50 |
| | | 7134.4 | $4,333,949.50 |

*See generally* (Dkt. #285).  With respect to this part of the Court's general lodestar analysis, the Fifth Circuit did not determine that the Court erred.  Insofar as the reasonable hours expended on the litigation as a whole did not take into account Plaintiffs' overall success, however, the Fifth Circuit determined that the Court did err.  According to the Fifth Circuit, the Court should have considered at the lodestar stage how Plaintiffs' overall success played into the lodestar.  Thus, the Fifth Circuit determined that the Court did not sufficiently support its conclusion as to the

reasonable number of hours expended and the Fifth Circuit directed the Court to make specific factual findings and conduct a more in-depth analysis.

After calculating the lodestar in its initial order, the Court then reviewed the *Johnson* factors to determine if any adjustments to the lodestar were necessary.  In its *Johnson* analysis, the Court further determined that there was no need to enhance or reduce the award (Dkt. #285 at p. 16).  Specifically, the Court determined:

> [e]nhancement of the lodestar is not warranted—this case does not present an "extraordinary circumstance" requiring enhancement. But reduction of the lodestar is not warranted either. After considering the *Johnson* factors not already subsumed by the lodestar, paying particular attention to the results-obtained factor, the Court concludes that the lodestar is reasonable.

(Dkt. #284 at p. 16).  In reaching this conclusion, the Court considered the time and labor required, the novelty and difficulty of the questions, the customary fee, the undesirability of the action, and the results obtained.

The Court held that the *Johnson* factors did not warrant an enhancement or reduction because (1) the time and labor required factor was subsumed by the lodestar, (2) this was not a novel case that blazed through uncharted territory, (3) Class Counsel's customary fee was already on the high end and, thus, an enhancement was not necessary despite a three-year delay in compensation, (4) the Supreme Court barred any use of the undesirability *Johnson* factor, and (5) although Plaintiffs only recovered on a fraction of their claims, all the work was done in good faith, the work expended did not prove fruitless, and the case involved a common core of facts and was based on related legal theories, meaning that much of Class Counsels' time was devoted generally to the litigation as a whole (Dkt. #285 at pp. 16–24).  Thus, the Court held that none of the *Johnson* factors required any adjustment to the base lodestar amount.

Although the Fifth Circuit held that the Court should have considered the results obtained as part of its lodestar calculation, when reviewing the Court's *Johnson* analysis, the Fifth Circuit

further held that the Court's analysis of Plaintiffs' success was nonetheless still lacking.  According to the Fifth Circuit, the Court's *Johnson* analysis did not properly compare the relief Plaintiffs sought with the relief Plaintiffs obtained.  However, as with the Court's lodestar calculation, the Fifth Circuit only took exception to how the Court analyzed Plaintiffs' overall success and not any other part of the Court's *Johnson* analysis.  That is, the Fifth Circuit did not hold that the Court erred in its analysis of the time and labor required, the novelty and difficulty of the questions, the customary fee, or the undesirability of the action.

Based on the Fifth Circuit's mandate, the Court will now re-examine the lodestar calculation and conduct a more detailed analysis of Plaintiffs' successful versus unsuccessful claims.  In conducting this analysis, the Court will rely on the above promulgated factual findings and conclusions of law.  If necessary, the Court will then discount the fee award to account for the work done solely in furtherance of the unsuccessful claims, whether by identifying specific hours that should be eliminated or by reducing the overall award by a percentage that only accounts for the successful claims.  In this case, a percentage-based reduction within the lodestar calculation is necessary.  However, no further enhancement or reduction is required because the results obtained are subsumed within the Court's lodestar calculation and none of the other *Johnson* factors warrant an adjustment.

Accordingly, for the reasons set out below, the Court determines that a fee reduction of 55% is appropriate based on Plaintiffs' overall success. The lodestar is $1,950,277.28.

**A.  The Lodestar Amount**

As the Fifth Circuit pointed out, when an attorneys' fee award encompasses both successful and unsuccessful claims, "the unsuccessful ones must 'be treated as if they had been raised in separate lawsuits' and excluded from the fee award" if they are unrelated to the successful ones.

*Fessler*, 23 F.4th at 416 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)).  When successful and unsuccessful claims are related, however, a "court's focus should shift to the results obtained and adjust the lodestar accordingly."  *Id.*  Thus, the Court must first determine if Plaintiffs' unsuccessful claims are inextricably intertwined with their successful claims such that they are related and cannot be disentangled.

In this case, the successful and unsuccessful claims are indeed related and incapable of being disentangled.  Successful and unsuccessful claims are related when the claims "share a common core of facts or related legal theories."  *Id.* at 434–35.  Here, all of Plaintiffs' claims share a common core of facts and are based on related legal theories.  The Court will first explain how all the claims are based on related legal theories and then the Court will explain which facts make up the common core of facts of each claim.

As to the claims regarding models #3412 and #3464 in the 2011 Settlement, the relevant causes of action include strict products liability,[10] breach of the implied warranty of merchantability and that the tanks were fit for the ordinary purposes in which the tanks were used,[11]

---

[10] To prevail on a strict products liability claim, a plaintiff must show that (1) the defendants sold the products, (2) their products were unreasonably dangerous or defective when they left their control, (3) those defects caused the plaintiff's injury, and (4) damages.  *Ortega Garcia v. United States*, 986 F.3d 513, 533 (5th Cir. 2021) (applying Texas law).  Plaintiffs alleged that the tanks-at-issue, which Defendant manufactured, distributed, and/or sold, suffered from a manufacturing defect and were not reasonably safe for their expected use when they left the control of Defendant.  According to Plaintiffs, because of this defect, the tanks cracked and caused damage to the personal and/or real property of Plaintiffs and class members.

[11] To show a breach of the implied warranty of merchantability that goods are fit for a particular purpose, whether under the Uniform Commercial Code generally or the version adopted within Texas, a plaintiff must prove (1) that the merchant sold goods to the plaintiff; (2) that the goods were unmerchantable, that is, unfit for ordinary purposes; (3) that the plaintiff notified the defendant of the breach; and (4) that the plaintiff suffered injury.  *Hartford v. Lyndon–DFS Warranty Servs, Inc.*, 2010 WL 2220443, *11 (Tex. App.—Houston [1st Dist.] May 28, 2010) (citing inter alia 2.314 cmt. 3, and *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667–68 (Tex. 1999)).  Proof of a defect is required for a claim of breach of implied warranty of merchantability under § 2.314.  *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 443 (Tex. 1989).  "To establish a breach of the implied warranty of fitness for a particular purpose, the plaintiff must establish that (1) the seller had reason to know any particular purpose for which the goods were required at the time of contracting and (2) the buyer was relying on the seller's skill or judgment to select or furnish suitable goods."  *Hartford*, 2010 WL 2220443 at *10–11.  The "particular purpose," however, must be a particular non-ordinary purpose.  *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 503 (Tex. App.—Eastland

and negligence.[12]  As to the claims regarding models #3412 and #3464 in the Texas Settlement, the relevant causes of action include breach of the implied warranty of merchantability and that the tanks were fit for the ordinary purposes in which the tanks were used as well as violations of the DTPA.[13]  Additionally, Plaintiffs requested injunctive and declaratory relief which is applicable, at least in part, to the 2011 Settlement and Texas Settlement.

Each of the causes of action and all of the relief requested by Plaintiffs is based on the overarching theory that Defendant defectively manufactured toilet tanks between the years 2004 and 2012.  According to Plaintiffs' theory, deviations in construction or quality during the manufacturing process caused defects in the tanks which rendered the tanks unfit for their intended purpose.  Plaintiffs alleged that Defendant subjected the tanks to improper temperature controls during manufacturing and that Defendant did not conduct any testing or quality control checks. Plaintiffs further asserted that Defendant breached a duty of care it owed consumers when it decided to manufacture tanks in this manner and breached the duty of care again when Defendant ineffectively informed the public of these defects.  Every cause of action in the Operative Complaint was based on these distinct but overlapping and related legal theories.

Defendant argues that the legal theories cannot be related because manufacturing defects

___

2002, pet. denied).  In this case, Plaintiffs alleged that Defendant breach the implied warranty by placing a defective product into the stream of commerce that was not fit for its intended purpose.  Further, Plaintiffs alleged that Defendant knew consumers were relying on its superior skill or judgment to furnish suitable goods for the purpose for which the goods are required.

[12] The elements of common law negligence in Texas are: (1) a legal duty owed by Defendant to Plaintiffs; (2) a breach of that duty; (3) damages which were proximately caused by the breach.  In this case, Plaintiffs alleged that Defendant owed Plaintiffs and class members a duty of care to manufacture, market, distribute, and sell the tanks in a safe and non-defective manner so as to avoid injury.  According to Plaintiffs, Defendant breached that duty by, among other things, manufacturing the tanks the way in which they did and misinforming the public as to the extent of the affected tank models.  Due to Defendant's alleged negligence, Plaintiffs claimed damage to their real and/or personal property.

[13] Under § 17.50(a)(2) of the DTPA, a consumer may bring an action where breach of an express or implied warranty constitutes a producing cause of economic damages or damages for mental anguish.  TEX. BUS. & COM. CODE § 17.50(a)(2).  As the Court has already discussed, Plaintiffs maintain that there was a breach of the implied warranty of merchantability and fitness for a particular purpose.

are unique to the manufacturing location.  Although it is true that a manufacturing defect is limited to the location of manufacture, *Fessler*, 23 F.4th at 417, the 2011 Settlement did not narrow its class to just those tanks manufactured at the Benito Juarez plant.  The 2011 Settlement class included all #3412 and #3464 tank models manufactured in 2011, regardless of the plant.  And, as the Court determined in its findings of fact, some of the model #3464 tanks, along with models #3425 and #3436, were manufactured at the Monterrey, Mexico location.  Likewise, models #3412, #3464, and #3425 were manufactured, at least in part, in Benito Juarez, Mexico. Additionally, models #3412, #3464, and #3425 were all toilet tanks of the same or similar design. And, while it is not clear where the other tank models were manufactured, it is clear from the record that manufacturing took place in at least one of the two Mexico manufacturing locations.

In addition, there was success, albeit limited, on model #3464 for two years which were not encompassed by the 2011 Settlement or Texas Settlement, and model #3436, which was wholly left out of the class recovery in the 2011 Settlement and Texas Settlements.  Seven individual named Plaintiffs, whose claims were not encompassed by the 2011 Settlement or Texas Settlement, were successful on the claims that they brought.

Moreover, the causes of action alleged by Plaintiffs required Plaintiffs to prove more than just a manufacturing defect.  First, even as to the causes of action that required Plaintiffs to prove a manufacturing defect, Plaintiffs were also required to prove that Defendant was aware that the tanks were being purchased for a particular purpose and that consumers notified Defendant of supposed defects in its toilet tanks.  Additionally, Plaintiffs alleged negligence with respect to Defendant's decisions regarding how Defendant manufactured its tanks and how Defendant handled admitted deficiencies.  The negligence cause of action required Class Counsel to investigate Defendant's practices and procedures as a whole rather than as to just a specific tank

model.

The legal theories at issue in this case did not begin and end at Plaintiffs' obligation to prove a manufacturing defect.  Instead, Plaintiffs' legal theories extended beyond a mere manufacturing defect and required Class Counsel to investigate Defendant's internal decision-making process, the actual decisions Defendant made, and the knowledge Defendant had at various points between 2004 and 2012.  The related legal theories made it so that the work Class Counsel conducted to prove a one claim necessarily overlapped or was the same as the work Class Counsel conducted to prove one or multiple other claims, regardless of whether that work resulted in success on every claim.

It is for these same reasons the Court concludes Plaintiffs' successful and unsuccessful claims involve a common core of facts.  As the findings of fact make clear, and as the Court discusses above, some of the tank models involved in the unsuccessful claims were manufactured at the same plant and during the same time period as the tank models involved in the successful claims and vice versa.  In addition, the knowledge held by Defendant's employees, supervisors, managers, or executives would have been the same regardless of which claims Plaintiffs were successful on.  This is true even though Plaintiffs later dropped certain models or discovered that some allegedly defective models were actually manufactured in different years or in a different manner.  It is simply the nature of our adversarial system, particularly when a large class action is involved, that the scope of the suit may change as discovery progresses and new facts are discovered.

Importantly, however, the two tank models for which Plaintiffs were most successful, models #3412 and #3464, have been part of the lawsuit since its inception.  Thus, the work done by Class Counsel—such as when Class Counsel conducted site visits, plant inspections,

depositions, or discovery—was all necessarily done for each tank model, not one or two specific tank models.  At a base level, all of Plaintiffs' allegations center around the common core of facts that Plaintiffs claim Defendant knew it had produced defective toilet tanks at two different manufacturing locations, yet acted unlawfully in how it handled those defects.

When successful and unsuccessful claims cannot be disentangled, a court's focus shifts to the results obtained.  *Hensley*, 461 U.S. at 436–37 ("The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.").  Based on the results obtained, courts should adjust the lodestar to account for a party's success or lack thereof.  *Id.*  However, "[t]here is no precise formula for courts to use in reducing the lodestar amount to reflect a plaintiff's limited success." *Benton v. United States E.P.A.*, No. 3:06-CV-1591, 2014 WL 5147983, at *6 (N.D. Tex. Oct. 14, 2014) (internal citations omitted) (cleaned up).  Instead, whether a court should adjust the lodestar amount upwards or downwards, and by how much, depends on the degree of success.  *Hensley*, 461 U.S. at 436–37.

For example, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee."  *Id.* at 436.  In some cases, a plaintiff may have obtained excellent results even if "the plaintiff failed to prevail on every contention raised in the lawsuit."  *Id.*  "If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."  *Id.*  This will be true even where a plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.  *Id.*

In this case, Plaintiffs were not successful on every claim and contention they raised. Plaintiffs recovered on only a handful of the claims that they brought.  Accordingly, the Fifth Circuit determined that the lodestar amount the Court originally awarded could not supported by

the Court's initial findings and analysis.  After the Court reconsider the facts of the case in light of the Fifth Circuit's mandate, the Court determines that a 55% reduction of the lodestar is warranted. This conclusion is based on the Court's factual findings, analysis of the results obtained, and additional review of Class Counsel's contemporaneous billing records,

Before the Court begins its analysis regarding Plaintiffs' degree of success, however, the Court must first address a discrepancy in what the Fifth Circuit has directed this Court to do and what this Court is actually capable of doing.  As the Court previously pointed out, the Fifth Circuit directed the Court to compare the monetary value Plaintiffs obtained with the actual monetary value Plaintiffs requested.  However, as is now clear from the Court's extensive review of the allegations and pleadings in this case, Plaintiffs did not, at any point, enumerate a specific monetary amount sought in their complaints.  To be sure, Plaintiffs asked for monetary compensation in the form of compensatory, punitive, and treble damages but Plaintiffs' requests did not specify what amount of monetary compensation Plaintiffs actually sought.  This is not fatal to the Court's ability to analyze Plaintiffs' success though.  After considering the circumstances of this case, it becomes apparent that it would have been impracticable for Plaintiffs to clearly determine what amount of damages to plead.

The circumstances of this case are as follows.  Plaintiffs alleged that tanks manufactured by Defendant were defective.  According to Plaintiffs, these defects caused the tanks to spontaneously crack and, in some cases, leak water.  Plaintiffs further alleged that Defendant knew of these defects and failed to properly warn consumers and, thus, failed to prevent additional damage to tank owners.  The specific monetary damages suffered by each Plaintiff or proposed class member, therefore, depends on a number of factors.  For example, the damages incurred are dependent on where in the house the tank was located, how long the tank was leaking, how far the

50

leak spread, how new the tank owner's house was, how much personal property was destroyed, or whether there were several tanks within one house that cracked and leaked.

Thus, there was no practical method by which Plaintiffs could calculate the sum of the monetary damages caused by Defendant's allegedly defective tanks.  Indeed, for any such calculation to be possible, it was necessary for there to first be (1) a certified class, (2) a means of calculating the number of members in that class, (3) knowledge of exactly when Defendant discovered the alleged defects, and (4) a means of determining exactly how much damage each class member may have incurred due to the allegedly defective tanks.  As such, the circumstances of this case necessitate a holistic approach to analyzing the results obtained by Plaintiff.

Although the Court believes that all of the work done by Class Counsel was necessarily spent in furtherance of Plaintiffs' successful claims, it is axiomatic that Plaintiffs failed to recover on many of the tank models-at-issue.  In the Operative Complaint, Plaintiffs sought recovery for five tanks manufactured over the span of nine years, totaling forty-five possible subcategories of tanks.  However, Plaintiffs only received compensation and benefits with respect to some of those tanks.  As to the 2011 Settlement and Texas Settlement, Plaintiffs recovered benefits with respect to ten subcategories of tanks, some of which were limited to one manufacturing plant location. Based only on these numbers, roughly 22% of the claims were successful.

However, those ten subcategories of tanks do not fully encompass the complex nature of Plaintiffs' success in this case.  Under a holistic approach, the Court must do more than compare monetary relief sought and obtained or the number of tank models and manufacturing years Plaintiffs alleged but did not recover for.  If the Court were to look at only these factors, it would not fully encompass the complex nature of Plaintiffs' overall success in this case.  Indeed, the holistic approach taken by the Court requires the Court to consider, among other things, the relief obtained by the individual Plaintiffs, the effect of Defendant's self-imposed replacement program,

and the nature of the work Class Counsel actually did.  The Court will address each in turn.

Some named Plaintiffs recovered on tanks which were not encompassed by the 2011 Settlement or Texas Settlement.  In addition, every individual Plaintiff named in this suit was compensated on an individual basis for the damages they claimed to have suffered due to Defendant's allegedly defective toilet tanks.  As the Court pointed out, there were seventeen named Plaintiffs throughout the life of this litigation and many of those seventeen named Plaintiffs received monetary compensation that exceeded even the largest possible payouts under the 2011 or Texas Settlements.[14]  Additionally, while most Plaintiffs were owners of model #3464 tanks manufactured within the years encompassed by the 2011 and Texas Settlement, that is not true of every Plaintiff.  For example, Andrew Hocker owned a model #3436 tank, but still received monetary compensation to settle his claims.  Considering the named Plaintiffs' claims which were not encompassed by the 2011 Settlement or Texas Settlement, there were seven more individuals who received benefits because of the work done by Class Counsel.  Considering the three additional subcategories of tanks for which individual named Plaintiffs recovered, Plaintiffs were successful on roughly 29% of their claims.

With respect to Defendant's replacement program, the settlement agreements provided benefits that the program did not.  Indeed, the settlement agreements undoubtedly provided more benefits than were originally available to tank owners.  Defendant's program released Defendant from any warranty claims and provided no monetary compensation.  Conversely, the settlement agreements, collectively, expanded warranty coverage and provided monetary compensation for any damages incurred because of the allegedly defective toilets.  It is true that some of the benefits—namely, replacement of tank models #3412 and #3464 at no cost—were already

---

[14] By way of example, Aaron and Stacey Stone, Daniel Sousa, and Mark and Amber Fessler all received compensation in excess of $4,000.

available.  However, Defendant's replacement program was not as effective as Defendant may have the Court believe.[15]   Otherwise, the 2011 Settlement and Texas Settlement provisions providing additional benefits to those who had already filed claims under Defendant's self-imposed replacement program would be superfluous.  Class Counsel's efforts, therefore, led to recovery for individuals that would have had no remedy or a limited remedy.

Equally important to consider are the notice benefits granted to class members of both class settlements.  Initially, under Defendant's own replacement program, there was no individualized notice to owners of the affected tank models.  On the other hand, under both the 2011 and Texas Settlements, Defendant was obligated to search its databases and locate the names and addresses of affected tanks owners and then provide those owners with notice of the settlement benefits they are entitled to.  Considering the expanded scope of benefits provided to tank owners and the new notice requirements, the Court believes that Plaintiffs were more than just 29% successful on their claims.

The claims here are all based on related legal theories and a common core of facts.  The Court previously concluded that the related legal theories for each tank made it so that the work Class Counsel conducted as to one of the tank models necessarily overlapped or was the same as the work conducted as to one or multiple other tank models.  The Court's determination that all Plaintiffs' claims share a common core of facts only strengthens this conclusion.  And, as the Court noted earlier, tank models #3412 and #3464, for which Plaintiffs were most successful, have been

---

[15] For exemplar, Defendant's replacement program offered no monetary compensation to owners of the afflicted tanks. Defendant's replacement program did not offer compensation to tank owners for any damage to tank owner's real and/or personal property caused by Defendant's tanks or additional damages stemming from the damage to tank owners' real and/or personal property.  Further, Defendant's replacement program did not cover the cost of delivery or installation of the replacement tank.  Essentially, individuals who knew of and used the replacement program were forced to spend more money after Defendant replaced the tanks that Defendant admitted suffered from "technical issues."  Now, not only are those individuals not forced to cover the extra costs associated with replacement and installation, but many of them are also able to recover monetarily for damages suffered due to damage caused by a cracked tank.

part of this litigation since the start.  Thus, the time that Class Counsel spent researching, briefing, conducting discovery, gathering evidence, taking depositions, preparing for mediation, and preparing for and conducting settlement negotiations was all time necessarily spent in furtherance of the successful claims.  Similar to the Court's conclusion of Plaintiffs' overall success in light of the Defendant's replacement program, the Court believes that Plaintiffs were more successful than is readily apparent.

With all of the above-noted considerations in mind, the Court spent considerable time pouring over Class Counsel's records again.  After this review—and considering the time already reduced to account for duplicative and unnecessary billing entries—the Court determines that 45% of the time billed by Class Counsel was reasonably necessary to litigate Plaintiffs' successful claims.  This award is in line with Plaintiffs' limited success and appropriately compensates Class Counsel for the time spent litigating the successful claims.  *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) ("A court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if 'the plaintiff failed to prevail on every contention.'") (quoting *Hensley*, 461 U.S. at 435); *see also Monroe v. Hous. Indep. Sch. Dist.*, No. 21-20642, 2023 WL 1434280, at *4 (5th Cir. Feb. 1, 2023) (affirming a district court's fee award even though the plaintiff did not prevail on every claim).  The Court's conclusion is based on the interconnected nature of Plaintiffs' claims, both legally and factually.  To be sure, "'when claims . . . share a common core of facts or related legal theories, a fee applicant may claim all hours reasonably necessary to litigate those issues.'"  *Monroe*, 2023 WL 1434280, at *4 (5th Cir. Feb. 1, 2023) (quoting *Fessler*, 23 F.4th at 416).

This conclusion is supported by the Fifth Circuit's recent decision in *Monroe*.  In *Monroe*, the Fifth Circuit affirmed a district court's decision to not adjust the lodestar despite the plaintiff's

failure to succeed on every claim.[16]  2023 WL 1434280, at *5.  The Fifth Circuit affirmed the district court's decision because of the court's in-depth analysis of the records and detailed factual findings addressing the interrelated nature of the claims.  *Id.* at *4–5.  Notably, the Fifth Circuit rejected the defendant's challenge that the award improperly included time spent on unsuccessful claims.  *Id.* at *4.  According to the Fifth Circuit, the district court convincingly explained that "the claims and steps in litigation leading up to Monroe's ultimate success shared both a 'common core of facts' and 'related legal' theories."  *Id.*

Here, the Court thoroughly reviewed the contemporaneous billing records submitted by Class Counsel and spent a considerable amount of time analyzing Plaintiffs' success in this case.  Indeed, the Court made detailed and specific factual findings regarding Plaintiffs' success.  The Court then applied those findings to the lodestar calculation.  Ultimately, the Court concluded that a reduction of 55% is necessary.  *See Picou v. City of Jackson, Miss*, 91 F. App'x 340, 341–42 (5th Cir. 2004) (approving a district court's reduction of fees by 75% because of limited success); *see also Chamberlain v. Waller Cnty. Asphalt Inc.*, No. 4:19-CV-4941, 2023 WL 25380, at *4 (S.D. Tex. Jan. 3, 2023) (reducing fees by 50% to account for limited success at trial); *Dodge v. Hunt Petroleum Corp.*, 174 F. Supp. 2d 505, 510 (N.D. Tex. 2001) (reducing fees by 75% to account for limited success at trial). This number takes into account that Plaintiffs were limited in their success, i.e., Plaintiffs only recovered on a portion of the allegedly defective tanks, while still bearing in mind that most, if not all, of the hours expended by Class Counsel in furtherance of this lawsuit involved the successful claims.

---

[16] A key difference between this case and the *Monroe* case is that *Monroe* was a Title VII case, i.e., a case involving alleged violations of the plaintiff's civil rights.  In those cases, the Fifth Circuit has repeatedly held that "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case' and 'the lodestar method yields a fee that is presumptively sufficient to achieve this objective.'"  *Monroe*, 2023 WL 1434280, at *5 (internal citations omitted) (cleaned up).  The case at hand is not a civil rights case.  Therefore, the same principles behind awarding the full fees amount do not apply.  On the contrary, in class actions such as this, courts are often concerned "attorneys exploit the class action device to obtain large fees at the expense of the class.'"  *Fessler*, 23 F.4th at 420.  Accordingly, a reduction is warranted here when it was not in *Monroe*.

*See Hensley*, 461 U.S. at 435 ("[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.").  Accordingly, for the reasons stated in this Order, the base lodestar is reduced by 55% from $4,333,949.50 to $1,950,277.28.

This reduction is also in line with the Fifth Circuit's directive that the Court's "scrutiny should 'guard against the public perception that the attorneys exploit the class action device to obtain large fees at the expense of the class.'"  *Fessler*, 23 F.4th at 420.

## B.  The *Johnson* Factors

As discussed, the Fifth Circuit also took issue with the Court's analysis of the eighth *Johnson* factor.  According to the Fifth Circuit, when conducting its analysis of the eighth *Johnson* factor, the Court should have considered the actual monetary value obtained versus the actual monetary value requested.  *Id.*  However, based on the Court's above lodestar calculation, to consider this factor again would be improper.  That is, the Court cannot consider the results obtained under both its lodestar calculation and its *Johnson*-factor analysis because this would result in "impermissible double counting."  *See Saizan v. Delta Concrete Prods. Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006).

After taking into consideration the other factors addressed in the Court's original attorneys' fee order—the time and labor required, the novelty and difficulty of the questions, the customary, fee, and undesirability of the action—the Court still sees no reason to adjust the base lodestar amount based on these other *Johnson* factors.  The reasons reiterated in this order for neither enhancing nor reducing the lodestar based on the remaining, relevant *Johnson* factors apply now as they did before.  Thus, no enhancement or reduction of the lodestar is warranted under the *Johnson* factors.

*         *         *

As a final aside, the Court notes that any attempt by Class Counsel to recover new fees incurred separate and apart from their original request for attorneys' fees are not properly before the Court.  The mandate rule requires a district court on remand to carry out the Fifth Circuit's mandate and to do nothing else; accordingly, Class Counsel cannot now attempt to add in additional hours not previously requested as part of the Court's order fulfilling the Fifth Circuit's directive on remand.  *See Newball v. Offshore Logistics Int'l*, 803 F.2d 821, 826 (5th Cir. 1986) (holding that "a mandate controls on all matters within its scope"); *Harris v. Sentry Title Co.*, 806 F.2d 1278, 1279 (5th Cir. 1987) ("It cannot be disputed that 'when the further proceedings [in the trial court] are specified in the mandate [of the Court of Appeals], the district court is limited to holding such as are directed.'").

## CONCLUSION

It is therefore **ORDERED** that Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Entry of Findings of Fact and Conclusions of Law (4:17-cv-1 Dkt. #353; 4:19-cv-248 Dkt. #111) is hereby **GRANTED in part** and **DENIED in part** and Plaintiffs' and Class Counsel's Motion for Entry of Findings of Fact and Conclusions of Law (4:17-cv-1 Dkt. #354; 4:19-cv-248 Dkt. #112) is hereby **GRANTED in part** and **DENIED in part**.  These motions are granted insofar as the parties' proposed findings and conclusions align with the Court's own findings and conclusions and denied insofar as the proposed findings and conclusions do not align with the Court's own findings and conclusions.

It is further **ORDERED** that Defendant Porcelana Corona De Mexico, S.A. de C.V.'s Motion for Leave to File Exhibit to Proposed Findings of Fact (4:17-cv-1 Dkt. #356) is hereby **GRANTED.**

It is further **ORDERED** that Plaintiffs' and Class Counsel's Opposed Motion for Leave to

File Objections to Porcelana's Sur-Reply and New Evidence (4:17-cv-1 Dkt. #366; 4:19-cv-248 Dkt. #125) is hereby **DENIED as MOOT** and Plaintiffs' and Class Counsel's Unopposed Motion for Leave to Supplement the Record in Light of Joint Status Report on Claims Administration (4:17-cv-1 Dkt. #374; 4:19-cv-248 Dkt. #133) is hereby **DENIED as MOOT.**

It is further **ORDERED** that Class Counsel is awarded **$1,950,277.28** in attorneys' fees.

**IT IS SO ORDERED.**

**SIGNED this 31st day of March, 2023.**

_____

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE